*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WIKSTROM/STRAND, Minors.

UNPUBLISHED
October 12, 2023

Nos. 364714; 364855
Marquette Circuit Court
Family Division
LC No. 13-009676-NA

Before: LETICA, P.J., and HOOD and MALDONADO, JJ.

PER CURIAM.

In Docket No. 364714, respondent-father appeals by right the trial court's order terminating his parental rights to his three children[1] under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions that led to adjudication). In Docket No. 364855, respondent-mother appeals by right the same order terminating her parental rights to the same children under MCL 712A.19b(3)(c)(*i*). We affirm.

## I. FACTUAL BACKGROUND

The court took jurisdiction over the children in July 2021, after respondents pleaded no contest to allegations of domestic violence, substance abuse by respondent-father, and a threat by respondent-mother to kill herself and the children.[2] Early in the case, respondents received woefully inadequate services, including the caseworker's ignoring respondents' concern about abuse in the initial foster home. However, respondents' caseworker was replaced by a dedicated and competent caseworker, and they were referred for and received appropriate services.

---

[1] The January 4, 2023 order terminated respondents' parental rights to MW (d/o/b 11/7/16), SS (d/o/b 12/6/19), and OS (d/o/b 2/8/21).

[2] Respondent-mother also has an older child, who was placed in a guardianship with her maternal grandmother after she entered foster care due to neglect.

In their new foster home, the children made great strides, receiving regular physical and occupational therapy that markedly improved their growth and development. The foster parent ensured that the children attended school and their many medical appointments.

During the pendency of the case, respondent-father made commendable progress by addressing his methamphetamine use and maintaining his strong bond with the children. Even so, the caseworker expressed concern that respondent-father struggled to parent three special-needs children on his own during his separate parenting time. Respondent-father also did not satisfactorily address his alcohol dependence. Moreover, he admitted to being a victim of domestic abuse by respondent-mother, but refused to leave the relationship despite the negative physical and emotional effects it had on the children. He testified at the termination hearing that he would leave respondent-mother and parent the children alone if necessary; however, he had taken no steps in this direction, despite being advised by the caseworker to do so during the pendency of the case.

Respondent-mother somewhat engaged in mental health services, but made no progress. She continued to have outbursts during parenting visits that negatively affected the children. Police were called after she pushed a caseworker out of her home. Her outburst at a hospital threatened to disrupt a surgery planned for one of the children. She also had outbursts in the courtroom. Her parenting educator and her therapist both opined that she had not benefited from their services. Shortly before the termination, respondent-mother's cigarette burned respondent-father, and the police were called to respond to the resulting incident, during which respondent-father's hand struck respondent-mother's hip and he punched a wall. Respondent-father initially told the police that respondent-mother had intentionally tried to burn him, but later stated that he was not sure whether she had acted intentionally.

The trial court ultimately determined that respondents were not making any progress. It found that respondents had not "seemed to internalize what they were taught by the ordered services." Although respondent-father had rectified his methamphetamine issues and became better able to control his alcohol intake, the home was unsanitary, respondent-mother had not demonstrated emotional stability, and respondents continued to engage in domestic violence. Respondent-father acknowledged that he was in an abusive relationship, but refused to find a separate home for himself and the children. Respondents continued to struggle with parenting the children. The court found that clear and convincing evidence to support termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*). After considering the children's bonds with the parents, respondents' parenting abilities, the children's great strides in foster care, and the foster parent's willingness to adopt the children, the trial court also found that termination was in the children's best interests and ordered respondents' parental rights terminated. Respondents' appeals were consolidated to "advance the efficient administration of the appellate process."[3]

---

[3] *In re Wikstrom/Strand Minors*, unpublished order of the Court of Appeals, entered March 14, 2023 (Docket Nos. 364714; 364855).

## II. STANDARDS OF REVIEW

This Court reviews for clear error the trial court's decision that petitioner has proved a ground for termination by clear and convincing evidence. *In re Curry*, 505 Mich 989, 991; 938 NW2d 735 (2020). This standard is "the most demanding standard applied in civil cases[.]" *Id.* (quotation marks and citation omitted, alteration in original). Clear and convincing evidence is clear, direct, and weighty evidence that allows the finder of fact to reach a conclusion without hesitancy. *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995). Evidence may be clear and convincing when contradicted, but sometimes uncontradicted evidence is not clear and convincing. *Id.* "Clear error exists when some evidence supports a finding, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *Curry*, 505 Mich at 991 (quotation marks and citation omitted). A reviewing court accords deference to the trial court's factual findings, given its opportunity to judge the credibility of the testifying witnesses. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). This Court also reviews for clear error whether the petitioner made reasonable efforts to reunify the family. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). Finally, this Court reviews for clear error the trial court's finding that terminating a parent's parental rights is in the children's best interests. *Id.* at 346.

## III. STATUTORY GROUNDS

Parents have a significant constitutional liberty interest in the care and custody of their children. *Stanley v Illinois*, 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972); *In re Miller*, 433 Mich at 346. To terminate a parent's parental rights, the trial court must find by clear and convincing evidence that at least one statutory ground for termination exists. *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 333; 985 NW2d 912 (2022). MCL 712A.19b(3)(c)(*i*) provides that the trial court may terminate a parent's rights if 182 days have elapsed since the entry of the initial dispositional order[4] and that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

### A. RESPONDENT-FATHER

Respondent-father raises a variety of arguments concerning how petitioner failed to help him address the issues leading to adjudication and how he rectified various parenting barriers. We are not definitely and firmly convinced that the trial court made a mistake when it found that MCL 712A.19b(3)(c)(*i*) supported terminating respondent-father's parental rights because, despite making progress in some areas, significant barriers still existed to safely return the children to his care.

First, respondent-father argues that petitioner should have done more to help him address respondents' domestic-violence issues, such as ordering respondent-mother out of the home.

---

[4] Neither parent disputes that this timeframe was satisfied.

Respondent-father also argues that he was willing to leave respondent-mother in order to take care of his children.

A parent's parental rights may not be terminated solely because the parent is a victim of domestic violence. *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. However, being a victim of domestic violence does not necessarily preclude termination of a parent's parental rights. *Id*. Termination may be based on a determination that the parent's "own behaviors were directly harming the children or exposing them to harm." *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). Persisting in a relationship with an abusive partner may support termination. See *id*. Further, when a victim is also a perpetrator, domestic violence may remain a concern that supports termination. *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. The trial court may consider whether the parent's conduct had the potential to psychologically harm the child. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). Children should not have to wait for long periods in foster care for "the mere possibility of a radical change in [the parent's] life." *In re Williams*, 286 Mich App 253, 273; 779 NW2d 286 (2009).

In this case, domestic violence was one of the initial circumstances that supported the court's taking jurisdiction. The court based much of its decision on the domestic violence between respondents and found that it had no hope that this situation would improve. During the pendency of the case, respondents worked with a relationship counselor. Respondent-father acknowledged that he was having difficulty practicing calming techniques or walking away from respondent-mother. Respondent-mother would instigate arguments and respondent-father would respond by yelling back, swearing, and calling her names in the presence of the children. The caseworker urged respondent-father to go to a domestic-violence shelter or seek alternative housing, but respondent-father almost immediately signed a two-year lease with respondent-mother and stated that he did not want to leave her. Respondents engaged in domestic violence shortly before the termination hearing, and even at the termination hearing, respondent-father again stated that he did not want to leave respondent-mother. Although respondent-father represented that he would do so for the sake of the children, he took no steps during the case to do so, and the caseworker opined that it was unlikely that he would.

It is very clear from the record that respondents' relationship is physically and verbally violent. Respondent-father had been given the opportunity to demonstrate that he would in fact put his children first by leaving his relationship with respondent-mother. Instead, he professed to love her and stayed in the relationship.

Further, this violence directly harmed the children. After respondent-mother's outbursts, one of the children would begin to hurt himself by banging his head on the floor or on the inside of a vehicle and crying. The middle child had issues sleeping and had "tearful" nights. The youngest child would get wide-eyed and grow very stiff, and after one altercation, she would scream if anyone raised their voice or made a loud noise. Although being a victim of domestic violence would not support termination on its own, in this case, respondent-father was actively involved in the conflict, and there was evidence that respondents' domestic relationship physically and emotionally harmed the children. The trial court did not err by considering the parties' domestic violence as a factor supporting termination of respondent-father's parental rights.

Second, respondent-father argues that, although he admitted to difficulties parenting his children, his parenting classes were delayed. Respondent-father also contends that he was not given the opportunity to parent the children in respondents' home in order to demonstrate his ability to care for them as a single father.[5]

DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). Those efforts include the duty to create a service plan that addresses the issues that led the trial court to exercise jurisdiction over the children in an attempt to reunify the family. *Id*. at 85-86. Thus, the reasonableness of DHHS's efforts affects the sufficiency of the evidence supporting the statutory grounds underlying the trial court's termination decision. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005).

In this case, the trial court found that parenting continued to be an issue. During joint parenting time, respondents argued instead of engaging with the children. The court found that, when given separate parenting time, respondent-father worked harder to be engaged with the children, but he was overwhelmed. It is undisputed that the initial caseworker did not provide respondent-father with anything approaching sufficient services. The children were removed from the home in July 2021, and respondent-father raised concerns about being given the wrong dates for their medical appointments, abuse in a foster home, and that the parenting time location did not account for one child's disabilities. The trial court expressly assured respondents that it did not hold those issues against respondents but rather held them against DHHS.

Respondent-father had his family education intake in February 2022, and the petition to terminate respondents' parental rights was filed in August 2022. Respondent-father's caseworker consistently stated that respondent-father had done well during parenting time, including when the children were outside the home. The children were happy to see him, he interacted with them positively, and he brought necessary items to the visits. However, the caseworker also testified that respondent-father struggled with the children because they had special needs, he became frustrated when they went in different directions, he became tired of them quickly, and he did not try to occupy them or engage in problem-solving to keep them from running off. The caseworker testified that she did not see an improvement in respondent-father's parenting between the time that he began family education and the time of the termination hearing. Respondent-father himself agreed that his parenting skills could be better, and he would not mind repeating the parenting classes (without respondent-mother) to gain additional insight.

It is commendable that respondent-father recognized that he had parenting deficiencies and that he would benefit from further parenting classes. Although respondent-father received belated parenting services, when the termination petition was filed, he had had six months of additional services, including a twelve-week program, addressing parenting skills. Even so, he had been

---

[5] But the record shows that respondents' lack of in-home parenting time was neither caused by nor contributed to by petitioner's lack of effort. Rather, respondent-mother's pushing a caseworker out the door, respondents' allowing a person with a criminal record to live with them, and the contributions by respondents—particularly respondent-mother—to an out-of-control bedbug infestation in the home made it necessary that parenting opportunities occur in a different location.

unable to improve to the point where he could take care of all three children at the same time. Further, in light of the previously discussed issues regarding domestic violence, we are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-father would not be able to improve his parenting abilities within a reasonable time.

Third, respondent-father argues that his issues were affected by unaddressed transportation problems. The record does not support this argument. Although transportation was identified as an issue early in the case, in February 2022, the caseworker discussed having provided respondents with bus tickets, volunteer transporters, and gas cards. Although the bus route stopped at 6:00 p.m., the caseworker indicated that gas cards could be given to cover the costs of transportation after that. The foster parent also had offered to help with transportation, and the foster parent scheduled the children's medical appointments "in a chunk" on the same weekday morning for them to be predictable. There is no indication that respondent-father would have fared better had he been provided with some additional, unidentified transportation service. See *In re Sanborn*, 337 Mich App 252, 264; 976 NW2d 44 (2021) ("When challenging the services offered, a respondent must establish that he or she would have fared better if other services had been offered.").

Fourth, respondent-father argues that the court erred by terminating his parental rights when he successfully addressed his substance-abuse issues. The trial court expressly found that respondent-father had rectified his methamphetamine issue and had not tested positive for 17 months. The extent of the trial court's findings regarding abuse of substances was a statement that "[respondent-father] also was better able to control his alcohol intake but had not given it up totally." It is not clear that the trial court found that respondent-father's alcohol use supported terminating his parental rights, but even if it did, its finding was not clearly erroneous. Respondent-father had reduced his drinking from "all day, every day" to two or three drinks a week. However, when asked whether his drinking was under control, he responded, "To a point, yes." He also had testified that there were times he exceeded the amount that he and his substance-abuse counselor had agreed on.

Regardless, the primary focus of the trial court's decision was respondents' unrectified domestic violence and inadequate parenting. On balance, we are not definitely and firmly convinced that the trial court made a mistake when it found that MCL 712A.19b(3)(c)(*i*) supported terminating respondent-father's parental rights.

B. RESPONDENT-MOTHER

Respondent-mother argues that she participated in the services offered to her, despite petitioner's delays, her physical difficulties, and petitioner's negative view of respondent-mother. Respondent-mother also argues that domestic violence and the cleanliness of the home improved significantly. We are not not definitely and firmly convinced that the trial court made a mistake when it found that MCL 712A.19b(3)(c)(*i*) supported terminating respondent-mother's parental rights because she made almost no progress toward rectifying the barriers that prevented a safe return of the children to her care.

First, respondent-mother argues that she participated in all the services that were offered to her. A parent must both participate in *and* benefit from services; simply participating in services

is not sufficient. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Even if conditions improved before the termination hearing, the court may consider the totality of the evidence when deciding whether "a parent accomplished meaningful change in the conditions that led to adjudication." *Jackisch/Stamm-Jackisch*, 340 Mich App at 334.

In this case, the trial court found that respondent-mother had not seemed to internalize what she was taught by the service providers. The court determined that respondent-mother continued to demonstrate emotional volatility. And respondent-mother's caseworker testified that she was not fully compliant with her mental health provider's recommendations. Specifically, she had not been seeing an individual therapist and her couples therapist opined that she had not benefited from her services. Respondent-mother's continued struggles were evidenced by her outbursts at caseworkers, respondent-father, the trial court, and the children. One such outburst caused one of the special-needs children to hurt himself while the two remaining children exhibited emotional responses. Although there was evidence that respondent-mother engaged in some services, particularly toward the end of the case, there is limited to no evidence that she benefited, even as her outbursts demonstrably affected the children's well-being.

Second, respondent-mother also argues that her caseworker took a negative view of her, which was why she engaged with her in a belligerent manner. The record does not support this argument. Rather, the record is replete with instances of respondent-mother engaging with a variety of people in a belligerent manner. Although the caseworker and respondents offered vastly differing views of her engagement during a birthday party at the end of the case, we do not agree that this established that the caseworker took a negative view of respondent-mother. Further, respondent-mother demonstrated her belligerence in many other ways. She pushed a different caseworker out of her home, was verbally abusive to respondent-father, was described as "explosive" by her parenting educator, and became aggressive during one of the children's surgeries. Respondent-mother left the courtroom during hearings when addressed by the court on more than one occasion. The record does not support that respondent-mother's belligerence was caused by a hostile caseworker.

Third, respondent-mother argues that she missed parenting time only because of illnesses and restrictions, and like respondent-father, respondent-mother argues that transportation presented a barrier to her participation in reunification services. Again, the record does not support these arguments. Respondent-mother's caseworker provided the same extensive variety of transportation assistance to respondent-mother as she did to respondent-father. After respondent-mother asserted that she was having busing issues because the bus needed to be scheduled two months in advance, the children's appointments were altered to a weekly block of time. And, although respondent-mother had stated that she could not have visits outside of her home because of her medical health needs, she withdrew her medical releases after verification was requested. Moreover, once the releases were reinstated, the caseworker discovered that respondent-mother did not have conflicting medical appointments. When respondent-mother was provided with an unlimited bus ticket, the caseworker found that respondent-mother gave the ticket to a friend to get groceries. The record does not reflect that a lack of transportation or respondent-mother's own health issues caused respondent-mother to miss the children's appointments. Further, to the extent that respondent-mother argues that illnesses and quarantine restrictions caused her to miss parenting time, these issues all occurred at the very end of the case. We are not definitely and

firmly convinced that the trial court made a mistake when it found that petitioner engaged in reasonable efforts toward reunifying respondent-mother with the children.

Fourth, respondent-mother argues that the state of the home improved significantly throughout the case. But the trial court found that the home "remained in an unhealthy state with garbage overflowing and a strong odor of cat urine just days before the termination trial." There continued to be a bedbug issue in the house and respondents allowed other adults to live in the home without those individuals paying rent or helping to clean it. The caseworker identified the cleanliness of the home as a safety issue early in the case, stating that the home was untidy with cat feces and old food on the floors. A caseworker stepped on a pin that penetrated her skin. These conditions were inappropriate for crawling children. The home also had a persistent bedbug infestation that respondent-mother fought with the caseworker about having remediated. The caseworker testified that, after the home was treated for bedbugs, respondent-mother moved furniture back into the home despite being advised not to do so, and the inspector subsequently reported new bedbug activity. Considering the children's young ages, issues such as pins on the floor and dirty floors had the direct ability to affect their health, not to mention the ongoing and unaddressed bedbug infestation.

Respondent-mother only briefly addresses respondents' domestic violence, referring to the regrettable incident before the termination hearing as a single instance that did not establish that the condition persisted. However, as discussed regarding respondent-father, respondents' domestic relationship did not improve and affected the children. Considering the entire record, we are not definitely and firmly convinced that the trial court made a mistake when it found that MCL 712A.19b(3)(c)(*i*) supported terminating respondent-mother's parental rights.

## IV. BEST INTERESTS

Respondent-father argues that the trial court erred by finding that terminating his rights was in the children's best interests because he and the children were deeply bonded and he had not been able to demonstrate his ability to parent the children in a home-like setting. Respondent-father also argues that the children's need for permanency could be satisfied by returning the children to him, and that the foster home did not have advantages over his home. The trial court did not clearly err when it found otherwise because, despite respondent-father's love for the children, other factors weighed in favor of termination being in the children's best interests.

To determine whether termination of a parent's parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks and citation omitted). The trial court may also consider "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. (quotation marks and citation omitted). Though the trial court may not consider the advantages of a foster home when determining whether it has statutory grounds to terminate a parent's parental rights, once it concludes that the statutory grounds are met, the trial court may consider the advantages of a foster home placement to determine the child's best interests. *In re Foster*, 285 Mich App 630, 635; 776 NW2d 415 (2009).

In this case, the trial court issued a very detailed opinion regarding the children's best interests. It found that respondent-father and the children had a bond and did well together, but it based its decision on his lack of parenting ability, the domestic violence between respondents and respondent-father's understanding of the effect it had on the children but his unwillingness to separate from respondent-mother, and the children's great strides in growth and development while in foster care. The court also considered in detail the children's flourishing in foster care and found that the children needed stability, permanency, and finality that respondents could not provide. Instead, respondents provided a chaotic environment that lacked a nurturing structure. Finally, the foster parent intended to adopt the children.

Respondent-father argues that the foster home lacked financial advantages. We note that the record does not address advantages or disadvantages. Regardless, the foster home had other advantages, and even if a financial disadvantage existed, this would be but one factor weighing against termination. Considering the entire record, we are not definitely and firmly convinced that the trial court made a mistake when it found that it was in the children's best interests for respondent-father's parental rights to be terminated.

Affirmed.

/s/ Anica Letica
/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado